## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JOSÉ RAÚL RIVERA ALGARÍN, his wife JOSEFINA FIGUEROA LÓPEZ, their CONJUGAL PARTNERSHIP, and their daughters VALERIA MICHEL RIVERA FIGUEROA and FABIOLA MARIE RIVERA FIGUEROA<br><br>Plaintiffs<br><br>v.<br><br>TRIPLE S VIDA, INC.;<br>TRIPLE S SALUD, INC.<br><br>Defendants | CIVIL NO.<br><br>RE: DISCRIMINATION IN EMPLOYMENT; ADEA; TITLE VII; PR LAW 100; PR LAW 80; PR LAW 115; COBRA/ERISA<br><br>JURY TRIAL REQUESTED |

## COMPLAINT

**TO THE HONORABLE COURT:**

COME NOW, the Plaintiffs, through the undersigned counsel, and respectfully STATE, ALLEGE AND PRAY:

### I. Nature of the Action

1.      This action is brought by Plaintiff José Raúl Rivera Algarín ("Rivera") against Triple S Vida, Inc. ("Triple S Vida"), his former employer, as a result of the discriminatory and retaliatory termination of employment to which he was subjected because of his age, and also motivated by his race (color), and for opposing Triple S Vida's unlawful employment practices. Co-Plaintiffs, Josefina Figueroa López ("Figueroa"), Valeria Michel Rivera Figueroa and Fabiola Marie Rivera Figueroa, Rivera's wife and minor daughters, are also suing seeking compensation for their own emotional and economic damages resulting from Rivera's discriminatory and retaliatory termination of employment. In addition, all Plaintiffs are suing Triple S Salud, Inc. ("Triple S Salud"), as Triple S Vida's group health plan administrator, for its failure to provide

each one of them, as qualified beneficiaries, with notice of their right to continue coverage under the group health plan after Rivera's discriminatory and retaliatory termination, in violation of COBRA.

2.      Plaintiffs suffered, and are still suffering, economic and emotional damages as a result of Defendants' actions, as alleged herein.

## II. Jurisdiction

3.      This Honorable Court has jurisdiction to entertain this action pursuant to the *Age Discrimination in Employment Act*, as amended, ("ADEA"), *Title VII of the Civil Rights Act of 1964 and 1991*, as amended ("Title VII"), the *Consolidated Omnibus Budget Reconciliation Act*, as amended ("COBRA") and the *Employee Retirement Income Security Act*, as amended ("ERISA"). Plaintiffs also invoke this Honorable Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 167, and seek relief under Puerto Rico Law No. 100 of June 30, 1959 ("Law 100"), Puerto Rico Law No. 80 of May 30, 1976 ("Law 80") and Puerto Rico Law No. 115 of December 20, 1991 ("Law 115").

4.      All conditions precedent to jurisdiction under the applicable federal and local statutes gave been complied with.

5.      Rivera filed a Charge of Discrimination before the Equal Employment Opportunity Commission ("EEOC") on August 11, 2020, and the Notice of Right to Sue was issued by the EEOC on March 23, 2021. **See Exhibits 1 and 2.**

6.      This is the proper venue to bring this action, since the facts relating to the causes of action asserted herein occurred in this District.

## III. Parties

7.      Rivera is a 59 year-old Puerto Rican black male, married to co-Plaintiff Josefina Figueroa López ("Figueroa"). They have two daughters of ages 16 and 15, respectively, which are also co-Plaintiffs in this case. All Plaintiffs are residents of Puerto Rico.

8.      Co-Defendant Triple S Vida is a private insurance company created under the laws of Puerto Rico. At all times pertinent to this action, Triple S Vida was Rivera's employer and had more than 100 employees.

9.      Co-Defendant Triple S Salud is a private insurance company created under the laws of Puerto Rico. At all times pertinent to this action, Triple S Salud was the administrator of Triple S Vida's group health plan of which all Plaintiffs were beneficiaries.

## IV.  Factual Allegations

10.      Rivera began to work as an employee of Triple S Vida in September 2014.

11.      At all times pertinent to this action, Rivera occupied the position of Insurance Sales Representative ascribed to the Caguas District.

12.      As part of his duties as Insurance Sales Representative for the Caguas District, Rivera had a pre-established route within the Municipality of Caguas and a list of clients in said route to which he had to sell Triple S Vida's insurance products. He also had to procure new sales and increase the list of clients.

13.      At all times pertinent to this action, Rivera's pre-established route within the Municipality of Caguas, assigned by co-Defendant Triple S Vida, was the Beatriz Ward and part of the Borinquen Ward in the Municipality of Caguas.

14.     At all times pertinent to this action, Rivera's direct and indirect supervisors were Jesús Figueroa ("J. Figueroa"), Caguas District Supervisor, and Ronald Adorno ("Adorno"), Caguas District Manager, respectively.

15.     At all times pertinent to this action, Michael Báez ("Báez") was Triple S Vida's Agency Vice President, and Juan Iglesias ("Iglesias") was Triple S Vida's  Human Resources Manager.

16.     At all times during his employment with Triple S Vida, Rivera was an excellent Insurance Sales Representative with no prior disciplinary record.

17.     According to his direct supervisor, J. Figueroa, Rivera was his best employee.

18.     Part of the duties of an Insurance Sales Representative when selling an insurance policy to a client is to ask the client who he/she desires to designate as the beneficiary.

19.     Ordinarily, Triple S Vida takes no disciplinary action against an Insurance Sales Representative if he/she commits an honest mistake when designating the insurance policy beneficiary.

20.     An official form exists in Triple S Vida to change the beneficiary of an insurance policy if the insured so desires, or if there has been any mistake in the designation of the beneficiary, among other situations in which the change of beneficiary may be warranted.

21.     When visiting clients to sell insurance policies, if the sale is actually made, the Insurance Sales Representative is supposed to provide the client with a conditional sales receipt.

22.     The conditional sales receipt that is given to the client contains the amount of the sale and the signature of the Insurance Sales Representative, among other information. At the same time, the Insurance Sales Representative who sells the insurance policy to the client is supposed to keep a copy of the conditional sales receipt with the signature of the client.

4

23.     At the time of the sale, the client also has to sign the insurance contract in the Insurance Sales Representative's tablet, and pay the first monthly premium installment. Subsequently, the Insurance Sales Representative is supposed to visit the client each month to collect the monthly premiums from the client, attempt to sell other insurance policies and/or provide any other service to the insured that may be required.

24.     According to his direct supervisor, J. Figueroa, Rivera was an example of ethics and moral in the workplace.

25.     Gloria Apolinaris ("Apolinaris") and Luis Carrillo ("Carrillo") are married, insureds of Triple S Vida and, at the time of the events alleged herein, had been clients of Rivera for around four (4) years. That is, Rivera sold them insurance policies and used to visit them each month to collect the monthly premiums of their insurance policies.

26.     Apolinaris and Carrillo reside in the Beatriz Ward of Caguas, which is part of the pre-established route that Rivera had as Triple S Vida's Insurance Sales Representative.

27.     Randy Pizarro ("Randy") has been the neighbor of Apolinaris and Carrillo for more than nineteen (19) years in the Beatriz Ward of Caguas.

28.     Randy is a 64 year old male who lives alone and who has a physical disability  in one of his arms since he was a kid.

29.     Randy does not drive motor vehicles, but he can walk and carry out his normal daily activities, including raising and taking care, on his own, of over 20 roosters.

30.     Randy  is not, and has never been, mentally disabled and has no, and has never had, any legal guardian.

31.     Throughout the years, Carrillo and Apolinaris have always helped Randy providing him with transportation to run errands, buy groceries, and taking him to medical appointments.

Also, Carrillo and Apolinaris help Randy cutting the grass and cleaning Randy's house. Also, because Randy has no mailbox, Carrillo and Apolinaris allow Randy to use their mailbox to receive correspondence.

32.    Rivera met Randy in one of Rivera's visits to Apolinaris' and Carrillos' house, at least around three (3) years ago.

33.    During the morning of September 10, 2019, several Triple S Vida's Insurance Sales Representatives from the Gurabo District visited Randy and sold him two insurance policies, to wit, (1) a cancer and catastrophic diseases insurance policy, and (2) a funeral insurance policy.

34.    When the Gurabo District Insurance Sales Representatives sold Randy the two insurance policies mentioned above, Randy was alone.

35.    In said insurance policies, Randy designated his sister Gladys Pizarro ("Gladys") as the beneficiary.

36.    As part of the process to sell the insurance policies to Randy, the Gurabo District Insurance Sales Representatives asked him for any document that could corroborate Randy's physical address. Randy told them that, since he received his correspondence at Apolinaris' and Carrillo's mailbox, they would have to visit Apolinaris' and Carrillo's house and ask them for said document.

37.    Accordingly, the Gurabo District Insurance Sales Representatives proceeded to visit Apolinaris' and Carrillo's house and asked them for Randy's electric or water bill, in order to corroborate Randy's physical address.

38.    As she was requested by the Gurabo District Insurance Sales Representatives, Apolinaris gave them Randy's electric bill, so that they could corroborate his physical address.

39.     During, or as a result of, their transaction and/or interaction with Randy on September 10, 2019, none of the Insurance Sales Representatives from the Gurabo District gave Randy any conditional sales receipt, nor any brochure, information, or document evidencing the purchase of any of the insurance policies that Randy purchased, or even the name of the Insurance Sales Representative(s) who sold the insurance policies to Randy.

40.     A little while later, after the Insurance Sales Representatives from the Gurabo District had already left, Randy called Apolinaris and told her that several Triple S Vida's Insurance Sales Representatives had visited him and that he had purchased two insurance policies from them. At that time, Randy did not know the district from which the Triple S Vida's Insurance Sales Representatives that had visited him were from.

41.     In said call to Apolinaris, Randy also asked her if the Triple S Vida's Insurance Sales Representatives had left them (*i.e.*, Apolinaris or Carrillo) any  receipt, document or information regarding the insurance policies that he had just bought, or at least any contact information, since they had not left him anything. Apolinaris told Randy that the Insurance Sales Representatives from Triple S Vida had not left her anything either, but that she had given them his electrical bill so that they could corroborate his physical address.

42.     Due to the lack of receipt or document evidencing Randy's purchase of the insurance policies, or even the name of the Insurance Sales Representatives involved, Randy and Apolinaris decided to call Rivera, their long-time known Triple S Vida Insurance Sales Representative, and asked Rivera to come by Randy's house, so that they could explain to Rivera what had just happened and seek the corresponding guidance from him.

43.     In response to the call, Rivera arrived at Randy's house in the afternoon of September 10, 2019. Apolinaris and Carrillo were already there.

7

44.     In an attempt to clarify the situation, Rivera asked Randy which insurance policies he had purchased, how much were the monthly premiums, where were the conditional sales receipts, the brochures, and/or the Insurance Sales Representatives' business cards and/or contact information. Randy responded that he believed he had purchased a funeral insurance policy and a cancer and catastrophic diseases insurance policy, respectively, but that the Insurance Sales Representatives that had visited him did not give him any document, receipt or contact information.

45.     Upon receiving said information from Randy, Rivera decided to call his immediate supervisor, J. Figueroa, to seek advice on how to proceed. After receiving Rivera's detailed explanation, J. Figueroa instructed Rivera to go ahead and sell Randy the same two insurance policies that Randy had allegedly purchased that morning to the Gurabo District Insurance Sales Representatives.

46.     During the process of selling Randy the two insurance policies, Rivera asked him whether he wanted to designate any relative or family member as the beneficiary. Randy responded that, although he had a sister, Gladys, he did not want to designate her as the beneficiary because all she did was visit him once a month to ask him for money as soon as he received his check from the Social Security. Instead, Randy instructed Rivera to designate Apolinaris, who really helped him with everything, as the beneficiary,

47.     When Rivera asked Randy for the initial premium payments, which amounted to approximately $55.00 for both policies, Randy informed Rivera that he did not have said amount readily available. However, Randy asked Carrillo to lend him the money until the next day, which Carrillo accepted, and so Randy was able to make the initial premium payments.

48.     Immediately thereafter, Randy signed the contracts in Rivera's tablet, and also signed the conditional sales receipts. Apolinaris, Carrillo and Rivera witnessed Randy sign.

49.     Rivera did not falsify any signature.

50.     Finally, Rivera explained to Randy that, to avoid having duplicity of insurance policies, Randy had to notify Triple S Vida that he wanted to cancel the two insurance policies that he had purchased in the morning. Thus, since Randy does not know how to write (except for his signature), Apolinaris drafted a letter for Randy's signature, in which he  requested Triple S Vida to cancel the two insurance policies that he had purchased on that morning. Randy signed said letter after the same was read out loud by Apolinaris in Randy's, Carrillo's, and Rivera's presence.

51.     Unhappy with the fact that Randy had requested to cancel the two insurance policies that he had purchased from them, just to purchase the same two policies from Rivera, the Insurance Sales Representatives from the Gurabo District complained to Triple S Vida's  management.

52.     Triple S Vida then proceeded to carry out a completely biased, discriminatory and retaliatory investigation against Rivera.

53.     Triple S Vida's management used the Gurabo District Insurance Sales Representative's complaint, and Rivera's participation in the investigation carried out by Triple S Vida, as an excuse to discriminatorily and retaliatorily terminate Rivera's employment because of his age, and also motivated by his race (color).

53.     Triple S Vida carried out an investigation whose only purpose was to show, in appearance, that an investigation was being made, or had been done, but in reality, the investigation was specifically designed to elicit the desired conclusion necessary to support Rivera's termination, even if Triple S Vida had to rely on, or create, false information, as well as ignore clear and readily available evidence, as it actually did.

54.     As part of its investigation, Triple S Vida's investigator, Ada Mejías ("Mejías"), instructed Randy's sister, Gladys, to draft a letter saying that Randy was mentally disabled, that he could not make decisions on his own, that Gladys was Randy's legal guardian, and that Randy's signature in the conditional sales receipt and in the contract had been falsified. All of this, however, was a big lie.

55.      Around three weeks after the events of September 10, 2019, Mejías interviewed Rivera and his immediate supervisor, J. Figueroa. In said interview, Rivera and J. Figueroa explained to Mejías everything that happened on September 10, 2019, as previously alleged herein.

56.     During Rivera's and J. Figueroa's interview with Mejías, Rivera questioned Mejías about the real reasons behind Triple S Vida's investigation against him, considering that he had done nothing wrong, and that he had sold the two insurance policies to Randy, as requested by Randy himself, and only after obtaining authorization from his immediate supervisor, J. Figueroa.

57.     Rivera also mentioned and complained that Triple S Vida's investigation was being carried out in a discriminatory fashion against him, because of his age and motivated by his black color, since other younger Insurance Sales Representatives, and of white color, had done far more serious offenses (assuming what Rivera did was an offense, which is denied), even with their supervisors' knowledge and encouragement, and no investigations had been done.

58.     During the course of Triple S Vida's so-called investigation, Rivera complained several times to J. Figueroa, Adorno, Iglesias and other Company executives that the alleged investigation that Triple S Vida was carrying out, and of which he was the clear target, was being carried out for discriminatory animus, because of his age and skin color.

59.     Rivera's direct and indirect supervisors, J. Figueroa and Adorno, agree that there was no legitimate business reason for Rivera's termination, and they have told this to Rivera on several occasions.

60.     Triple S Vida's investigation conclusions are false, and a pretext to discriminate against Rivera because of his age, and motivated by his race (color).

61.      Rivera's complaints to J. Figueroa, Adorno, Mejías, Iglesias and other Company executives, as mentioned above, regarding Triple S Vida's investigation, constituted protected activity under both ADEA and Title VII.

62.     Both J. Figueroa and Adorno, direct and indirect supervisors of Rivera, knowing what had really happened and knowing the excellent quality of an employee and of a person that Rivera is, strongly advocated against Rivera's termination to Triple S Vida's management, pointing out that they were certain that Rivera had not falsified anything and that there was no basis for terminating Rivera's employment. However, Triple S Vida's management, *i.e.*, Juan Iglesias and Michael Báez, decided to terminate Rivera's employment  anyways, because of his age and motivated by Rivera's black skin color.

63.     Other Triple S Vida employees that are younger than Rivera, and of white complexion, and that have committed far more serious offenses, including plain and simple theft, have not been terminated, as was Rivera.  For example, Magali Colón and Priscila, from Caguas District, among others.

64.     Triple S Vida incurred in willful and malicious violations of the federal statutes invoked herein, and acted with reckless indifference against Rivera.

65.     Rivera was discriminatorily and retaliatorily terminated on July 3, 2020, almost ten months after the events of September 10, 2019.

66.    Rivera was notified of his termination by J. Figueroa and Adorno, both of which vehemently opposed Rivera's termination.

67.    When Adorno and J. Figueroa notified Rivera of his termination, they told Rivera that, if it was up to them, they would legally challenge Rivera's termination because there was really no cause for Rivera's termination.

68.     At the time of Rivera's termination, Defendant's decisión-makers, to wit, Iglesias and Báez, knew that Rivera had not falsified any signature.

69.    Knowing that the reason for Rivera's termination (*i.e.*, the falsification of Randy's signatures) was not true, Triple S Vida's management attempted to articulate additional reasons after Rivera's termination, in order to strenghten its position in the face of a potential claim, such as this one, but which are clearly a pretext to cover discrimination and retaliation.

70.    For example, Triple S Vida added as reasons for Rivera's termination, that Rivera improperly designated Apolinaris, instead of a relative of Randy, as the beneficiary in Randy's insurance policies, and that Rivera allowed Carrillo, Apolinaris' husband, to lend Randy the money to pay the initial policy premiums. These additional reasons are weak, inconsistent, incoherent and mere pretexts to discriminate and retaliate against Rivera because of his age and on the basis of his race (color).

71.    In addition, Triple S Vida regularly issues insurance policies in which persons other than relatives of the insured are the designated beneficiaries, without no Insurance Sales Representative being terminated from employment.

72.    Also, situations in which a third party lends the money to an insured to pay an initial or regular monthly premium occur with relative frequency, even with the encouragement of

supervisors and managers in order to complete the sale, without no Insurance Sales Representative being terminated from employment.

73.     After Rivera's termination, J. Figueroa admitted to him that he had been terminated as a bag of shit ("como un saco de mierda" in Spanish).

74.     After Rivera's discriminatory and retaliatory termination from his employment, a younger employee was hired to replace him, with a salary lower than Rivera's.

75.     At the time of his discriminatory and retaliatory termination from employment, Rivera had already qualified, in the first place within all Caguas District, for a company trip to Turkey, with a cash value of $6,000.00. However, because Rivera was discriminatorily and retaliatorily terminated, he could not go to Turkey and also was not refunded the trip's cash value.

76.     After Rivera's discriminatory and retaliatory termination, Triple S Vida requested the Puerto Rico Insurance Commissioner Office ("PRICO") to investigate Rivera, in an attempt to have the PRICO issue a finding that Rivera had violated any provision of the Puerto Rico Insurance Code, or had otherwise done something wrong. However, the PRICO concluded that Rivera did nothing wrong.

77.     All Plaintiffs were qualified beneficiaries of Triple S Vida's group health plan. After Rivera's  termination from his employment, on July 3, 2020, and up to this date, none of the Plaintiffs was, or has been, notified of their right to continued coverage, in violation of COBRA.

78.     Plaintiffs became aware that they had no medical plan coverage, shortly after Rivera's termination, when they visited the dentist and were notified that the medical plan had been cancelled. They had to pay $250.00 in said visit. Since then, they have had to pay thousands of dollars in medical bills and medicines. They have been unable to secure medical plan coverage since Rivera's  discriminatory and retaliatory termination.

79.     Because of Rivera's discriminatory and retaliatory termination, all Plaintiffs have suffered, and are suffering, severe emotional and economic damages.

## V. Causes of Action

**A.      First Cause of Action - Age Discrimination under ADEA**

1.      Plaintiffs re-allege all previous paragraphs as if fully alleged herein.

2.      ADEA provides that "[i]t shall be unlawful for an employer to . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. Sec. 623(a)(1).

3.      The facts alleged herein constitute a wilfull and malicious violation by Triple S Vida to Rivera's rights under the ADEA's anti-discrimination provision.

4.      As a result of Triple S Vida's discriminatory termination of Rivera's employment, Rivera has suffered, and will continue to suffer, economic damages in excess of $500,000.00.

**B.      Second Cause of Action – Retaliation under ADEA**

1.      Plaintiffs re-allege all previous paragraphs as if fully alleged herein.

2.      ADEA's anti-retaliation provision states, in pertinent part:

It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section[.]

29 U.S.C. Sec. 623(d).

3.      The facts alleged herein constitute a wilfull and malicious violation by Triple S Vida to Rivera's rights under the ADEA's anti-retaliation provision.

4.      As a resulf of Triple S Vida's retaliatory termination of Rivera's employment, Rivera has suffered, and will continue to suffer, severe economic damages in excess of $500,000.00.

**C.      Third Cause of Action -Race Discrimination under Title VII**

1.      Plaintiffs re-allege all previous paragraphs as if fully alleged herein.

2.      Title VII's anti-discrimination provision states, in pertinent part:

It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

42 U.S. Code § 2000e–2(1)

3.      The facts alleged herein constitute a wilfull and malicious violation by Triple S Vida to Rivera's rights under Title VII's anti-discrimination provision.

4.      As a result of Triple S Vida's discriminatory termination of Rivera's employment, Rivera has suffered, and will continue to suffer, severe economic damages in excess of $500,000.00, and severe emotional damages in excess of $500,000.00.

**D.      Fourth Cause of Action – Retaliation under Title VII**

1.      Plaintiffs re-allege all previous paragraphs as if fully alleged herein.

2.      Title VII's antiretaliation provision states, in relevant part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C.A. Sec 2000e-3(a)

3.      The facts alleged herein constitute a wilfull and malicious violation by Triple S Vida to Rivera's rights under Title VII's anti-retaliation provision.

4.      As a result of Triple S Vida's retaliatory termination of Rivera's employment, Rivera has suffered, and will continue to suffer, severe economic damages in excess of $500,000.00, and severe emotional damages in excess of $500,000.00.

**E.      Fifth Cause of Action – Violation to COBRA**

1.      Plaintiffs re-allege all previous paragraphs as if fully alleged herein.

2.      Section 502(c) of ERISA, 29 U.S.C. 1132(c), provides that if a group health plan administrator fails to provide the requisite COBRA notices, a court has discretion to find the administrator personally liable to the each participant for up to $110 per day from the date of failure until the date of correction.

3.      The facts alleged herein constitute a violation by Triple S Salud of its obligations towards Plaintiffs under ERISA and COBRA, as Triple S Vida's group health plan administrator.

**F.      Sixth Cause of Action – Unjust Dismissal under PR Law 80**

1.      Plaintiffs re-allege all previous paragraphs as if fully alleged herein.

2.      The facts alleged herein constitute an unjust termination of Rivera's employment, in violation to PR Law 80. See 29 L.P.R.A. 185a.

3.      According to PR Law 80, Rivera is entitled to a severance ("mesada" in Spanish") of approximately $35,000.00.

**G.      Seventh Cause of Action – Age and Race Discrimination under PR Law 100**

1.      Plaintiffs re-allege all previous paragraphs as if fully alleged herein.

2.      PR Law 100 provides, in pertinent part, that "[a]ny employer who discharges . . . an employee . . . on the grounds of age . . . race, color . . . [s]hall incur in civil liability [f]or a sum equal to twice the amount of damages sustained by the employee . . . on account of such action[.]" 29 L.P.R.A. 146(a)(1).

3.      The facts alleged herein constitute age and race discrimination under PR Law 100.

4.      Rivera has suffered severe emotional and economic damages as a result of his discriminatory termination of employment, which are estimated in at least $500,000.00.

**H.      Eight Cause of Action – Retaliation under PR Law 115**

1.      Plaintiffs re-allege all previous paragraphs as if fully alleged herein.

2.      PR Law 115 provides, in pertinent part, that "[n]o employer may discharge . . . an employee . . . because the employee offered or attempted to offer, verbally or in writing, any testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico, as well as testimony, expression or information offered or attempted to offer within the internal procedures established in the company, or before any employee or representative in position of authority, when such expressions are not of a defamatory nature nor constitute disclosure of privileged information established by law." 29 L.P.R.A. 194a(a).

3.      The facts alleged herein constitute retaliation under PR Law 115.

4.      Rivera has suffered severe emotional and economic damages as a result of his retaliatory termination of employment, which are estimated in at least $500,000.00.

**I.      Wife's and Daughters' Derivative Damages Claim – Article 1536 of the PR Civil Code**

1.      Plaintiffs re-allege all previous paragraps as if fully alleged herein.

2.      Article 1536 of the Puerto Rico Civil Code provides that "[t]he person who through fault or negligence causes damage to another, is obliged to repair it."

3.      The facts alleged herein show that Triple S Vida, through fault or negligence, caused severe emotional and economic damages to all Plaintiffs.

4.      Rivera's wife and daughters hereby bring derivative damages claims against Triple S Vida as a result of Rivera's discriminatory and retaliatory termination of employment.

## VI.  Relief

**WHEREFORE**, Plaintiffs pray to this Honorable Court to:

1.      Grant this Complaint in its entirety;

2.      Order Triple S Vida to make Rivera whole by granting compensation for Rivera's loss of income, back pay, front pay and loss of benefits in an amount not less than $500,000.00.

3.      Award Rivera compensation for his emotional damages in the amount of no less than $500,000.00.

4.      Award Rivera compensatory damages in the amount of $500,000.00.

5.      Order the reinstatement of Rivera in his employment;

6.      Award Rivera punitive damages and double damages.

7.      Award Rivera his severance ("mesada") under PR Law 80;

8.      Award each Plaintiff the $110 daily penalty for Triple S Salud's failure to notify them of their right to continued health plan coverage, in violation of COBRA.

9.      Award damages to Figueroa in an amount of not less than $100,000, and to Rivera's two daughters in an amount of not less than $50,000 each.

10.     Award Plaintiffs the costs of this action, together with reasonable attorney's fees.

11.     Award Plaintiffs pre judgment interest.

12.     Grant Plaintiffs such other relief as this Honorable Court deems appropriate and proper.

A jury trial is requested.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on April 25, 2021.

**s/ Andrés C. Gorbea Del Valle**
Andrés C. Gorbea Del Valle
USDC-PR Bar No. 226313
PO Box 195191, San Juan, PR00919
(787) 217-2234
andres_gorbea@yahoo.com